UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
                                          :

CHRISTOPHER KRIEG                  :

                                    :

                  Plaintiff,     :           No. 15-CV-03626 (GED)(HBP)

                                    :

    -against-                :          **SECOND AMENDED**
                                        **COMPLAINT AND**
                          :          **DEMAND FOR**

CITY OF NEW YORK;            :          **JURY TRIAL**
NELDRA ZEIGLER, New York City    :
Police Department ("NYPD") Deputy    :
Commissioner, Equal Employment    :
Opportunity; GERARD BEYRODT     :
NYPD Detective; MICHAEL HEALY,    :
Retired NYPD Sergeant; FLORIN KUKA,  :
NYPD Detective; RYAN LANE, NYPD  :
Detective; THEODORE LAUTERBORN,  :
NYPD Captain; ALESSANDRO      :
LONGARDINO, NYPD Detective;     :
CHRISTOPHER MCGUINNESS; NYPD  :
Detective; MANUEL RODRIGUEZ;    :
NYPD Detective; DANIEL TICALI;    :
NYPD Detective; JAMES WILLIAMS,   :
NYPD Detective; DMITRY         :
BRUSHNIVSKY, NYPD Officer      :

                                    :

                 Defendants.   :
------------------------------------------------------x

## PRELIMINARY STATEMENT

      1.      This is an action by Christopher Krieg, who is paralyzed from the waist

down and requires a wheelchair for mobility, against the City of New York and NYPD

officials who, in the course of an arrest, transported Mr. Krieg in a dangerous and

dehumanizing manner.  On three separate occasions during the course of his arrest and

booking in June 2012, Defendants handcuffed Mr. Krieg behind his back and placed him

on the floor of a seatless cargo hold of a van without securing him in any way.  They placed his wheelchair upright in the van with him and did not secure it at all, causing it to collide with Mr. Krieg throughout the transport.  At the local precinct Mr. Krieg was subjected to further injury and indignity when he was handcuffed to an exterior bar of a holding cell because the cell was not wheelchair accessible.  Mr. Krieg, who also suffers from urinary incontinence, was then forced to sit in his urine soaked clothing for almost ten hours because Defendants refused to allow him access to self-catheterization supplies.  Defendants also held him waiting in the van outside of Manhattan Central Booking because the facility was not wheelchair accessible, and deprived him of medication and medical assistance during the course of his arrest and detention.

2.     Mr. Krieg alleges that Defendants' actions and policies violate Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, and the Fourth and Fourteenth Amendments to the United States Constitution.  He seeks compensatory and punitive damages, in addition to such other relief as this Court deems appropriate.

## PARTIES

3.     Plaintiff Christopher Krieg is a citizen of New York, and currently resides in Rome, New York, where he is detained in the Walsh Regional Medical Unit at the Mohawk Correctional Facility ("Mohawk").  All the events giving rise to the Complaint occurred in the State of New York, while Mr. Krieg was in the custody of the NYPD.

4.     Defendant City of New York is a municipal corporation duly organized and existing under and by virtue of the law of the State of New York.  Defendant City of New York maintains the NYPD, a department authorized to perform all functions of a

2

police department for the City of New York. The New York City Department of Correction ("DOC") is an agency of the City of New York. DOC is the government agency responsible for maintaining the booking area of Manhattan Central Booking. The New York City Department of Citywide Administrative Services ("DCAS") is an agency of the City of New York. DCAS is the responsible entity for maintaining public areas of New York County Criminal Court. Manhattan Central Booking is located within New York County Criminal Court. The City of New York, the NYPD, DOC and DCAS all received federal financial assistance at all times relevant to this Complaint.

5.    Defendant Deputy Commissioner Neldra Zeigler, is and was, at all times relevant hereto, Deputy Commissioner, Office of Equal Employment Opportunity for the NYPD. Deputy Commissioner Zeigler is the NYPD's ADA Coordinator and as such is responsible for coordinating the efforts of the NYPD to comply with the Americans with Disabilities Act. Defendant Zeigler is being sued in her individual capacity.

6.    Defendant Detective Gerard Beyrodt, shield no. #0221, is and was, at all times relevant hereto, an NYPD employee, who is currently assigned to 25 Detectives Squad, 120 East 119th Street. Defendant Beyrodt is being sued in his individual capacity.

7.    Defendant Michael Healy is a retired police sergeant, whose shield number is unknown to Plaintiff at this time. He was, at all times relevant hereto, employed by the NYPD as a police sergeant. Defendant Healy is being sued in his individual capacity.

8.    Defendant Detective Florin Kuka, shield no. #6529, is and was, at all times relevant hereto, an NYPD employee, who at all times relevant hereto was assigned

to the Narcotics Bureau Brooklyn South, Narcotics Division.  Defendant Kuka is being sued in his individual capacity.

9.      Defendant Detective Ryan Lane, shield no. #16447, is and was, at all times relevant hereto, an NYPD employee, who at all times relevant hereto was assigned to the Narcotics Bureau Brooklyn South, Narcotics Division.  Defendant Lane is being sued in his individual capacity.

10.     Defendant Captain Theodore Lauterborn, shield no. #1979, is and was, at all times relevant hereto, employed by the NYPD as a police captain.  Defendant Lauterborn is being sued in his individual capacity.

11.     Defendant Detective Alessandro Longardino, shield no. #7210, is and was, at all times relevant hereto, an NYPD employee, who at all times relevant hereto was assigned to the Narcotics Bureau Brooklyn South, Narcotics Division.  Defendant Longardino is being sued in his individual capacity.

12.     Defendant Detective Christopher McGuinness, is and was, at all times relevant hereto, an NYPD employee, who at all times relevant hereto was assigned to the Narcotics Bureau Brooklyn South, Narcotics Division.  Defendant McGuinness is being sued in his individual capacity.

13.     Defendant Detective Manuel Rodriguez, is and was, at all times relevant hereto, an NYPD employee, who at all times relevant hereto was assigned to the Narcotics Bureau Brooklyn South, Narcotics Division.  Defendant Rodriguez is being sued in his individual capacity.

14.     Defendant Detective Daniel Ticali, is and was, at all times relevant hereto, an NYPD employee, who at all times relevant hereto was assigned to the Narcotics

Bureau Brooklyn South, Narcotics Division.  Defendant Ticali is being sued in his

individual capacity.

15.      Defendant Detective James Williams, shield no. #6664, is and was, at all

times relevant hereto, an NYPD employee, who at all times relevant hereto was assigned

to the Narcotics Bureau Brooklyn South, Narcotics Division.  Defendant Williams is

being sued in his individual capacity.

16.      Defendant Dmitry Brushnivsky is and was, at all times relevant hereto, an

NYPD employee, who at all times relevant hereto was assigned to the 60th Precinct.

Defendant Brushnivsky is being sued in his individual capacity.

17.      At all times relevant herein, the individual Defendants were acting under

color of state law in the course and scope or their duties and functions as officers of the

NYPD.

## JURISDICTION AND VENUE

18.      This action arises under Title II of the Americans with Disabilities Act, 42

U.S.C. § 12132 *et seq.*, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794,

and under 42 U.S.C. §§ 1983 and 1988 for violations of the Fourth and Fourteenth

Amendment to the United States Constitution.

19.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331

(federal question) and 1343(a)(3) (civil rights).

20.      Venue is proper in the Southern District of New York pursuant to 28

U.S.C. § 1391(b)(2) and (c) because a substantial part of the events giving rise to the

claim occurred in Manhattan and Defendant City of New York is located in Manhattan in

the Southern District.

## FACTUAL ALLEGATIONS

21.     Plaintiff Christopher Krieg has been a T-3[1] paraplegic since 2003.  He is completely paralyzed from the waist down and uses a wheelchair for mobility.

22.     As a paraplegic, Mr. Krieg is a qualified individual as defined by the Americans with Disabilities Act, 42 U.S.C. § 12102(2), and the Rehabilitation Act of 1973, 29 U.S.C. § 705(20).

23.     Mr. Krieg's paraplegia constitutes a physical impairment.  This impairment causes him to be substantially limited in a number of major life activities, including but not limited to walking, standing, sitting, reaching, lifting and bending, as well as the operation of major bodily functions, such as musculoskeletal and genitourinary function.

24.     Since he became paralyzed, Mr. Krieg has suffered from urinary incontinence.  As a result, he requires a straight catheter in order to urinate and must catheterize every three to four hours.  If he does not he runs the risk of contracting a urinary tract infection.

25.     Prior to and at the time of his arrest, Mr. Krieg was prescribed numerous medications to treat the effects associated with his paraplegia.  For example, he was required to take pain medication and muscle relaxants every four hours to treat pain and prevent muscle spasms.  Mr. Krieg was also prescribed a trans-dermal analgesic patch for pain management, which he was to change and reapply every seventy-two hours. Additionally, at the time that this cause of action arose, Mr. Krieg needed to take

---

[1] T-3 refers to the specific location of his injury.  Mr. Krieg's injury occurred at the third thoracic vertebra.  He is a complete paraplegic, with lower body paralysis and loss of bladder function.

antibiotics every six hours to prevent infections from developing because he was recovering from a surgery he underwent in April 2012 to repair a shattered right hip.

**Arrest of Mr. Krieg**

26.     On June 15, 2012, Mr. Krieg woke at about 8:00 a.m., and began his daily medication schedule.  First, he took his pain medication and self-catheterized.  Then, at about 10:00 a.m., Mr. Krieg took the antibiotics he was prescribed to prevent an infection from developing in his surgical site where pieces of his shattered right hip bone had been surgically removed just two months earlier.  See infra ¶¶ 122–27.  Mr. Krieg was scheduled to replace his pain patch at approximately 4:00 p.m. that day.

27.     All of these prescribed medications, as well as the bag that contained Mr. Krieg's self-catheterization supplies, were in an organized, open and obvious location in his bedroom; the prescriptions were on top of his dresser and his self-catheterization supplies were on top of a chair.

28.     In the afternoon, with guns drawn and wearing tactical SWAT gear, such as helmets and shields, Defendants Beyrodt, Healy, Kuka, Lane, Longardino, McGuinness, Rodriguez, Ticali, and Williams executed a warrant to arrest Mr. Krieg and a warrant to search his apartment.  Defendant Lauterborn was the tactical supervisor for this search and arrest.

29.     Defendants entered Mr. Krieg's apartment and ordered him to "put his hands up."

30.     As Mr. Krieg complied with this order, Defendant Beyrodt grabbed Mr. Krieg's right arm and twisted it behind his back, and then pulled him out of his wheelchair and threw him to the floor.  This maneuver by Defendant Beyrodt caused Mr.

Krieg's head and shoulder to violently smash against the ground.  Defendant Lane rear-cuffed Mr. Krieg as he was being restrained on the ground by Defendant Beyrodt.

31.     Defendants Healy, Kuka, Longardino, McGuinness, Rodriguez, Ticali, and Williams were present during the execution of this maneuver.

32.     Defendants Healy, Kuka, Longardino, McGuinness, Rodriguez, Ticali, and Williams did not intervene to prevent Defendants Beyrodt and Lane from handcuffing Mr. Krieg in the above manner.

33.     At no point in time did Mr. Krieg resist Defendants' orders.

34.     The NYPD Patrol Guide, the department's internal rulebook, provides no explicit guidance concerning how to safely effectuate the arrest or handcuffing of individuals who use wheelchairs or who are paraplegic.

35.     Mr. Krieg was placed directly on his right side causing the weight of his body to aggravate the post-surgical wound on his right hip.  Because of his paralysis he was unable to move his body off of the surgery site or shift his weight to relieve the pressure placed on top of it.

36.     In a loud and clear voice, Mr. Krieg told Defendant Lane that he recently underwent surgery on his right hip and had staples suturing the surgical site, and needed to be put back into his wheelchair so as to not continue to exacerbate the post-surgical wound.

37.     Despite his request, Defendant Lane left Mr. Krieg on the floor in this position while Defendants Beyrodt, Healy, Kuka, Longardino, McGuinness, Rodriguez, Ticali, and Williams conducted a cursory search of the apartment searching for other individuals and/or weapons – of which there were none.

8

38.    Upon information and belief, Defendants Beyrodt, Healy, Kuka, Lane, Lauterborn, Longardino, McGuinness, Rodriguez, Ticali, and Williams knew that Mr. Krieg was released from Coney Island Hospital just days before executing the June 15, 2012 warrants.  See infra ¶¶ 110–21.

39.    Upon information and belief, Defendants Beyrodt, Healy, Kuka, Lane, Lauterborn, Longardino, McGuinness, Rodriguez, Ticali, and Williams also knew that Mr. Krieg had been at Coney Island Hospital in April 2012 recovering from surgery on his hip.  Id.

40.    Defendants, Healy, Kuka, Longardino, McGuinness, Rodriguez, Ticali, and Williams searched each room of Mr. Krieg's apartment, including his bedroom where his medication was organized on his dresser and his self-catheterization supplies were stored in a bag.

41.    Minutes later, Defendants completed their search of the apartment and returned to the living room.

42.    Still lying on the floor resting on his side on top of his post-surgical hip and wound, Mr. Krieg told Defendants Beyrodt, Healy, Kuka, Lane, Longardino, McGuinness, Rodriguez, Ticali, and Williams that he recently underwent surgery on his right hip and had staples suturing the surgical site, and needed to be put back into his wheelchair so as to not continue to aggravate the post-surgical wound.

43.    Following Defendant Healy's order, Defendants Beyrodt and Lane put Mr. Krieg back in his wheelchair.

44.    The officers proceeded to tell Mr. Krieg that he was being taken to the local police precinct, and began to escort him out of the apartment.  At this time, Mr.

Krieg told Defendants Beyrodt, Healy, Kuka, Lane, Longardino, McGuinness, Rodriguez, Ticali, and Williams that because of his medical conditions he needed to bring his antibiotics and other medications with him to the precinct.  Knowing that he could develop a urinary tract infection if he did not self-catheterize every three to four hours, Mr. Krieg further stated that he needed to take his self-catheterization supplies with him so that he could urinate.

45.     In response to Mr. Krieg's pleas for access to his self-catheterization supplies, antibiotics and other medications, Defendant Beyrodt stated, "You ain't fucking taking shit."  None of the other Defendants present made any attempt to provide Mr. Krieg with this medical assistance.

**Transportation of Christopher Krieg to 60th Precinct**

46.     Defendants Beyrodt, Healy, Kuka, Lane, Longardino, McGuinness, Rodriguez, Ticali, and Williams escorted Mr. Krieg out of his apartment to a parking lot where there were three unmarked police vehicles.  Two of these vehicles were sedans and the other was a large white cargo van.

47.     Not one of these vehicles was wheelchair accessible because, on information and belief, the NYPD has no wheelchair-accessible vehicles in its fleet.

48.     Defendant Beyrodt knew prior to June 15, 2012 that Mr. Krieg was paralyzed from the waist down and requires a wheelchair for mobility.  See infra ¶¶ 110–13.

49.     Upon information and belief, Defendants Beyrodt, Healy, Kuka, Lane, Longardino, Lauterborn, McGuinness, Rodriguez, Ticali, and Williams knew prior to

June 15, 2012 that Mr. Krieg was paralyzed from the waist down and requires a wheelchair for mobility.  Id.

50.     The cargo van the officers brought to arrest Mr. Krieg had only two seats – one for the driver and another for the front passenger.  There were no restraints, tie down straps, lifts or other accessibility features.  There were no other seats in the cargo van; just a metal floor.

51.     Jonathan Tabon, the co-defendant in Mr. Krieg's criminal case, was detained in the back of the cargo van at this time.

52.     Defendants Beyrodt, Healy, Kuka, Lane, Longardino, Lauterborn, McGuinness, Rodriguez, Ticali, and Williams appeared uncertain as to how to safely transport Mr. Krieg, along with his forty pound metal wheelchair, to the local precinct.

53.     Defendant Healy instructed the officers to put both Mr. Krieg and his wheelchair into the cargo van.

54.     None of the officers asked Mr. Krieg how to safely or properly transport him and/or his wheelchair.

55.     Defendants Lane and Beyrodt lifted Mr. Krieg out of his wheelchair and placed him in an upright position on the floor of the van with his legs splayed out and his upper body against the side of the van.  Mr. Krieg remained rear-cuffed throughout.

56.     Defendant Lane placed Mr. Krieg's wheelchair in the van.

57.     Defendants Kuka, Longardino, McGuinness, Rodriguez, Ticali, and Williams failed to intervene when Mr. Krieg was placed in the van in this extremely dangerous manner with his wheelchair untethered.

58.     Defendants Beyrodt, Healy, Kuka, Lane, Longardino, McGuinness, Rodriguez, Ticali, and Williams did not secure the heavy metal wheelchair in any manner.  Rather, they left it standing upright on top of its wheels so that it would freely roll around the cabin of the van.

59.     Captain Lauterborn who supervised Mr. Krieg's arrest failed to ensure that Mr. Krieg's disability was accommodated in the course of his arrest and search of his apartment.  Despite his knowledge of Mr. Krieg's disability and medical condition, Defendant Lauterborn did not arrange for accessible transportation or for Mr. Krieg's access to medical care or assistance with daily living, such as catheters.

60.     Defendant Lane drove the van to the 60th Precinct while Defendant Beyrodt sat in the passenger seat.

61.     Due to his paraplegia and because he was still handcuffed with his hands behind his back, Mr. Krieg was physically unable to keep himself upright during the drive, which left him lying on the metal floor completely prostrate.

62.     Each time Defendant Lane accelerated, slowed, or turned the van, Mr. Krieg's body would bounce on the metal floor and collide against the walls of the van.

63.     Mr. Krieg's wheelchair continuously smashed into him during the drive because the wheels were not locked and it was not tied down in any way.  Furthermore, the wheelchair had a hard metal footplate that protruded from its bottom.  Because of the way he was positioned, the footplate repeatedly struck Mr. Krieg in his surgery site.

64.     Mr. Krieg suffered physical pain and contusions to his head, legs, and post-surgical wound as a result of this transportation to the 60th Precinct.

**Processing at 60th Precinct**

65.     Upon arriving at the 60th Precinct in Brooklyn, Mr. Krieg was removed from the van by Defendants Lane and Beyrodt, placed into his wheelchair, and brought into the precinct where he and Mr. Tabon were taken to the holding pen area.  Mr. Krieg was detained at the precinct for approximately ten hours.

66.     At this time, Mr. Krieg was in severe, constant pain with particularly sharp sensation emanating from his right hip and post-surgical wound.

67.     Mr. Tabon was placed inside a holding cell and his handcuffs were removed.  Because the cell doorway was too narrow to fit his wheelchair, Mr. Krieg could not be placed inside a holding cell.

68.     Because the cell was not wheelchair accessible, Defendant Lane moved Mr. Krieg up against the outside of the cell and handcuffed his right arm to the exterior cell bar.  Mr. Tabon and another arrestee who was being held at the precinct were placed uncuffed inside the holding cell.

69.     This position was extremely painful to Mr. Krieg because it caused constant pressure to be applied to the entire right side of his body aggravating his right hip and post-surgical wound.  The pain in his hip was now excruciating.

70.     Mr. Krieg asked Defendants Beyrodt, Lane, and Brushnivsky to provide him with a catheter and access to a restroom.  These Defendants ignored Mr. Krieg's requests.

71.     By contrast, when Mr. Tabon requested to use the restroom, his request was granted and he was escorted to the restroom by an officer.

72.     Instead of addressing Mr. Krieg's rapidly and visibly deteriorating health, Defendant Beyrodt, after finishing his paperwork, took Mr. Krieg to an interrogation room.

73.     Mr. Krieg told Defendant Beyrodt at this time that he felt feverish and nauseous, needed medical assistance, and needed to catheterize himself.

74.     Defendant Beyrodt ignored these requests and returned Mr. Krieg to his previous position with his right hand handcuffed to the cell exterior.

75.     Mr. Krieg continued to feel feverish and nauseous.  He also began to feel a painful buildup of pressure in his bladder as a result of not catheterizing in four to five hours.  Shortly thereafter, the pressure in Mr. Krieg's bladder became so great that he involuntarily urinated.  His shorts were completely soaked in urine as a result.

76.     The portion of Mr. Krieg's shorts which covered the post-surgical wound was completely soaked in blood as well.  The blood splotch on his shorts was approximately the size of a baseball and there was also blood dripping down his leg.

77.     Defendants Beyrodt, Lane, and Brushnivsky were sitting within approximately fifteen feet of Mr. Krieg at this time.

78.     After urinating on himself and realizing that he was bleeding from his post-surgical wound, Mr. Krieg told Defendants Beyrodt, Lane, and Brushnivsky that he needed immediate medical attention.

79.     Mr. Krieg's requests for medical assistance were ignored.

80.     Mr. Krieg's health deteriorated drastically through the course of his detention.  His fever persisted as did his nausea, causing him to vomit.

81.     Mr. Krieg continued to ask Defendants Beyrodt, Lane, and Brushnivsky for medical assistance.  These requests were ignored.  He also continued to ask these defendants for access to a catheter.  These requests were also ignored.

82.     Mr. Krieg was forced to endure the indignity of urinating on himself two to three more times while detained at the 60th Precinct.  By the time he was transported to Manhattan Central Booking later that night, Mr. Krieg's clothes were completely saturated in urine.

83.     Contrary to the instructions of his doctors, Mr. Krieg had sat upright in his wheelchair for approximately ten hours which caused sores to develop on his back and buttocks.

84.     For the majority of the time he was detained at the 60th Precinct, Mr. Krieg was handcuffed to the cell exterior, which caused his right hip and post-surgical wound to be continuously aggravated.

85.     The sharp, excruciating pain that developed as a result of the conditions of Mr. Krieg's detention was substantially different than the level of pain he had felt prior to his arrest that morning.

**Transportation to Manhattan and Central Booking**

86.     After 12:00 a.m., June 16, 2012, Mr. Krieg and Mr. Tabon were transported from the 60th Precinct in Brooklyn to Manhattan Central Booking.

87.     Mr. Krieg and Mr. Tabon were brought to Manhattan Central Booking because the investigation leading to their arrest was run by the Special Narcotics Division in Manhattan and prosecuted by the Office of the Special Narcotics Prosecutor in Manhattan.

88.     Defendants Beyrodt and Lane loaded Mr. Krieg back into the same van that was not wheelchair accessible, and transported him in the identically painful, dangerous and dehumanizing manner as he was brought to the precinct: handcuffed with his hands behind his back, not supported or wearing a seatbelt, and unprotected from his wheelchair that was not secured in place.

89.     When they loaded Mr. Krieg into the van, Defendants Beyrodt and Lane lifted Mr. Krieg in such a manner as to avoid touching his urine soaked clothing.

90.     During the drive to Manhattan Central Booking, Mr. Krieg was in agonizing pain; his pain was worse than he had felt at the 60th Precinct.

91.     Approximately ten hours had passed since Mr. Krieg took his antibiotics or pain medication, properly self-catheterized, or even had a sip of water.  Mr. Krieg had missed approximately one to two doses of his antibiotics thus far.  Approximately eight hours had passed since Mr. Krieg was supposed to apply a fresh pain patch.

92.     Mr. Krieg, as during his previous transportation to the 60th Precinct, could not support himself upright during the drive into Manhattan.  As a result, Mr. Krieg was prone on the van floor throughout the approximately thirty to forty minute drive.  His wheelchair collided with his body approximately ten times during this period.

93.     Throughout the transportation he repeatedly requested medical assistance. Neither Defendants Lane nor Beyrodt paid any heed to his requests.

94.      The van arrived at Manhattan Central Booking after 1:00 a.m., June 16, 2012.  Defendant Beyrodt removed Mr. Tabon from the van and brought him into Central Booking while Defendant Lane remained in the van with Mr. Krieg.

16

95.     Lying prone on the van floor, Mr. Krieg again requested medical assistance.  Defendant Lane, however, replied something to the effect of "don't worry; you're going in [to Central Booking] next."

96.     Defendant Beyrodt returned approximately ten minutes later and, upon information and belief, told Defendant Lane that Central Booking had refused to admit Mr. Krieg for continued processing and detention because he uses a wheelchair.

97.     Defendants Beyrodt and Lane decided to drive Mr. Krieg to Bellevue Hospital Center in Manhattan.  It was there that he finally received the medical attention he had been requesting for hours.

**Transportation to Bellevue Hospital**

98.     Defendants Beyrodt and Lane again transported Mr. Krieg in the same extremely dangerous and painful manner as done twice before: rear-cuffed; prostrate on the van floor; and with his wheelchair not secured colliding with him throughout the drive.

99.     Transporting Mr. Krieg to Bellevue Hospital in this manner, in a van that was not wheelchair accessible, further exacerbated his physical injuries.

**Treatment at Bellevue Hospital**

100.     Mr. Krieg arrived at Bellevue Hospital Center after 2:00 a.m., and Defendant Beyrodt escorted him to the Emergency Room.

101.     Mr. Krieg was taken through the intake process at which time he notified the admitting nurse and doctor about his medical history concerning his April 2012 hip surgery from which he was recovering, the conditions of his detention through the day, and the drastic deterioration of his health that occurred while in police custody.

17

102.    Upon hearing this information, the admitting doctor castigated Defendant Beyrodt as to why he had failed to bring Mr. Krieg to a hospital sooner in light of Mr. Krieg's serious medical condition.

103.    Detective Beyrodt replied that he had not done so because he needed to first complete the arrest process.

104.    The admitting doctor determined that Mr. Krieg needed to be admitted for treatment.  Once Mr. Krieg was admitted to Bellevue Hospital, Defendant Beyrodt transferred him into the custody of NYPD officers who were assigned to the hospital.

105.    Before departing, in response to Mr. Krieg's question as to what he was being charged with, Defendant Beyrodt taunted Mr. Krieg with the remark that he was going to jail for a very long time.

106.    X-rays and bone scans taken during treatment at Bellevue Hospital revealed that Mr. Krieg had developed osteomyelitis, a serious bone infection caused when an open fracture or surgery wound is exposed to bacteria.  The infection began in the right side of Mr. Krieg's hip, but also spread to his left side.  It caused him great pain.

107.    Upon information and belief, the conditions for which Mr. Krieg received care at Bellevue were caused in whole or in part by the Defendants' actions throughout the course of his arrest and booking.

108.    Mr. Krieg was in such poor health during this time that he was visited by a member of Bellevue Hospital's palliative care unit to discuss his preferred life support procedures.  Mr. Krieg remained hospitalized at Bellevue Hospital until July 31, 2012, when he was transferred to the hospital ward at Rikers Island.

109.   Mr. Krieg battled the infection that had spread to both his hips for over three months.

**Defendants' Prior Knowledge of Mr. Krieg's Medical Condition and Disability**

110.   Defendant Beyrodt was the lead detective in charge of the investigation that led to Mr. Krieg's June 2012 arrest.

111.   This criminal investigation was conducted between December 2011 and June 2012.  The investigation consisted of undercover purchases of narcotics from Mr. Krieg's criminal co-defendant, Mr. Tabon, and the surveillance of both Mr. Krieg and Mr. Tabon.

112.   An arrest warrant for Mr. Krieg, as well as a warrant to search his apartment, located at 2946 23rd Street, Apartment 13E, Brooklyn, New York, was issued as a result of this investigation.

113.   Defendant Beyrodt was made aware through this investigation that Mr. Krieg is a paraplegic who required a wheelchair for mobility.

114.   As the arresting officer for the June 15, 2012 warrants, Defendant Beyrodt was responsible for planning the day's operation.

115.   Upon information and belief, Defendants Beyrodt, Healy, Kuka, Lane, Longardino, Lauterborn, McGuinness, Rodriguez, Ticali, and Williams were made aware through this investigation that Mr. Krieg is a paraplegic who required a wheelchair for mobility.

116.   Prior to June 15, 2012, Mr. Krieg informed a member of the NYPD investigation team that he is paraplegic and required a wheelchair for mobility.

117.     Despite this knowledge, Defendants failed to obtain a wheelchair-accessible vehicle to execute the arrest of Mr. Krieg on June 15, 2012.

118.     Upon information and belief, Defendants Beyrodt, Healy, Kuka, Lane, Longardino, Lauterborn, McGuinness, Rodriguez, Ticali, and Williams were also made aware through this investigation that Mr. Krieg was hospitalized at Coney Island Hospital from April 2012 until June 2012.

119.     Upon information and belief, Defendants Beyrodt, Healy, Kuka, Lane, Longardino, Lauterborn, McGuinness, Rodriguez, Ticali, and Williams were aware that Mr. Krieg was released from Coney Island Hospital just days before the warrants were executed against him.

120.     Prior to June 15, 2012, Mr. Krieg informed a member of the NYPD investigation team that he was hospitalized at Coney Island Hospital where he underwent surgery.

121.     Despite this knowledge, Defendants ignored Mr. Krieg's requests for medical assistance throughout the course of his arrest and detention on June 15, 2012.

**April 2012 Hospitalization and Surgery**

122.     In April 2012, while attempting to transfer from his bed to his wheelchair, Mr. Krieg fell to the floor of his bedroom shattering his right hip.

123.     To treat the injury, Mr. Krieg was admitted to Coney Island Hospital, where doctors surgically removed a fragment of bone from his right leg.  As a result of the operation, Mr. Krieg had a post-surgical wound extending from his lower right hip to his upper right leg.  This incision was sutured with several staples.

124.     Upon information and belief, Mr. Krieg remained at Coney Island Hospital for over a month recovering from his surgery, and was discharged no earlier than June 8, 2012.  Mr. Krieg treated his surgical site by applying fresh gauze as needed and keeping the site clean.  Mr. Krieg experienced no post-operative bleeding between his discharge and June 15, 2012 when he was arrested.  The surgical site remained closed during this period as well.

125.     To prevent an infection from developing and to manage the post-surgical pain, Mr. Krieg was prescribed antibiotics and pain medication.

126.     To ensure that the post-surgical wound and his right hip healed properly, the doctors treating him at Coney Island Hospital instructed Mr. Krieg to not remain in his wheelchair for longer than thirty to sixty minutes at a time.  Mr. Krieg was told that to do otherwise would place pressure on his hip and post-surgical wound, which would negatively affect his recovery.

127.     To aid his recovery, Mr. Krieg was required to sleep on a special air mattress in order to relieve pressure from his hip and post-surgical wound.

**The City's Policy and Practice of Failing to Accommodate Arrestees with Mobility Disabilities**

128.     The NYPD has no written policy regarding the transportation of arrestees who use wheelchairs for mobility.

129.     Upon information and belief, the current NYPD Patrol Guide provides officers with little guidance regarding how to transport individuals who use wheelchairs.

130.     Upon information and belief, the NYPD patrol fleet has no wheelchair-accessible vehicles.

131.    In the last few years, numerous incidents of NYPD police officers inappropriately interacting with individuals who use wheelchairs and violating their rights under the federal disability statutes have occurred.

132.    For example, on November 17, 2011, during an Occupy Wall Street protest near the New York Stock Exchange, Nadina LaSpina, a disability rights activist who uses a wheelchair, was detained by police officers.  Upon information and belief, because the police officers did not have sufficient training regarding how to transport Ms. LaSpina, the police officers therefore issued her a ticket instead.  This incident was reported by The Daily News.

133.    Two days later, on November 19, 2011, Robert Filer, who is paraplegic and uses a wheelchair for mobility, was allegedly injured during the course of his arrest by police officers because he was not transported in a wheelchair-accessible vehicle but rather in an unmarked police vehicle that was not wheelchair accessible.

134.    In another incident, on August 8, 2012, police officers arrested several wheelchair users who were protesting outside of Gracie Mansion, where then-Mayor Michael Bloomberg was hosting an event celebrating the Americans with Disabilities Act.  Upon information and belief, the police had no idea how to facilitate arresting the protestors, as no wheelchair-accessible vehicles were available to take the protestors to the police station.  Eventually, the police officers requested that an Access-a-Ride[2] vehicle be dispatched to transport the group to the local precinct.

135.    On January 2, 2014, Fredrick Brennan, who was born with osteogenesis imperfecta and uses a wheelchair for mobility, traveled to the NYPD 6th Precinct to look

_____

[2] Access-A-Ride, City of New York's paratransit system, provides transportation for people with disabilities who are unable to use public bus or subway service.

at a lineup of individuals suspected of robbing him the night before.  Because the lineup

viewing room was not wheelchair accessible, an NYPD detective had to lift Mr. Brennan

out of his wheelchair and hold him up to see through the window to look at the men in

the lineup.  Due to an impending snowstorm that night, Mr. Brennan asked for a ride

home following the lineup but was told that the NYPD did not have a wheelchair-

accessible van.  The police officers requested an Access-a-Ride vehicle for his

transportation home to Brooklyn but the service was unavailable.

136.    In March 2015, the New York Lawyers for the Public Interest ("NYLPI"),

a nonprofit law firm, issued the report, Accessible Justice: Ensuring Equal Access to

Courthouses for People with Disabilities, which documents numerous accessibility issues

individuals who use wheelchairs for mobility encounter at Manhattan Central Booking.

(available at http://www.nylpi.org/wp-content/uploads/2015/03/Accessible-Justice-

NYLPI-3-23-15.pdf).  In particular, the report details that multiple clients of NYLPI have

reported that they were carried down flights of stairs to be booked and processed at

Central Booking following an arrest.

137.    Taken in conjunction, these examples demonstrate that the NYPD does

not have a policy to ensure compliance with the federal disability statutes.  Upon

information and belief, these examples represent only a portion of the total number of

instances that officials in the NYPD interfere with the rights of individuals who use

wheelchairs for mobility.

138.    Defendant Zeigler, as the Deputy Commissioner, Equal Employment

Opportunity for the NYPD, is the designated coordinator responsible for the agency's

compliance with the Americans with Disabilities Act.  Defendant Zeigler is required to

ensure that the NYPD implements policies, practices or procedures necessary to comply with the statute to avoid discriminating against individuals with qualified disabilities.  As the ADA Coordinator, Defendant Zeigler failed to implement or modify NYPD policies, practices and procedures concerning individuals who require wheelchairs for mobility. Upon information and belief, Defendant Zeigler was aware of past incidents of NYPD police officers inappropriately interacting with individuals who use wheelchairs and violating their rights under the ADA.  Nonetheless, Defendant Zeigler did nothing to implement or modify NYPD policies, practices and procedures concerning individuals who use wheelchairs for mobility.

### CAUSES OF ACTION

### COUNT 1
**Violation of Rights Pursuant to Title 42 U.S.C. § 12132 *et seq.*
(Title II of the Americans With Disabilities Act)**

**Against Defendant City of New York**

139.     Plaintiff repeats and realleges the allegations set forth in paragraphs numbered 1 through 138.

140.     Defendant City of New York's failure to accommodate Plaintiff's qualified disability during his arrest, transportation, detainment at the 60th Precinct and admittance to Central Booking in Manhattan constitutes discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12132.  As a direct result of said discrimination, Plaintiff experienced significant injury, pain, suffering, mental stress, humiliation and indignity.

### COUNT 2
**Violation of Rights Pursuant to Title 29 U.S.C. § 794 *et seq.*
(Section 504 of the Rehabilitation Act)**

**Against Defendant City of New York**

141.     Plaintiff repeats and realleges the allegations set forth in paragraphs numbered 1 through 138.

142.     At all times relevant to this Complaint, Defendant City of New York and NYPD, DOC and DCAS received funding from the federal government of the United States.

143.     Defendant City of New York's failure to accommodate Plaintiff's qualified disability during his arrest, transportation, detainment at the 60th Precinct and admittance to Central Booking in Manhattan violates Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.  As a direct result of said discrimination, Plaintiff experienced significant injury, pain, suffering, mental stress, humiliation and indignity.

## COUNT 3
### Violation of Civil Rights Pursuant to Title 42 U.S.C. § 1983
### (Fourth and Fourteenth Amendments)

**Against Defendants Gerard Beyrodt, Michael Healy, Florin Kuka, Ryan Lane, Theodore Lauterborn, Alessandro Longardino, Christopher McGuinness, Manuel Rodriguez, Daniel Ticali, and James Williams**

144.     Plaintiff repeats and realleges the allegations set forth in paragraphs numbered 1 through 138.

145.     Defendants, acting in concert and under the color of state law at all times relevant to this Complaint, threw Plaintiff from his wheelchair during their search and then on three separate occasions placed Plaintiff lying down on the hard metal floor of a cargo van with his arms handcuffed behind his back, completely prostrate and unsecure with his wheelchair in the back of the cargo van also unsecured and colliding with him during these three occasions.  None of the Defendants present intervened to prevent these

25

actions at any time, despite multiple opportunities to do so.  These actions constitute an

unreasonable use of force and/or violations of Plaintiff's due process rights.

146.    Defendants Beyrodt and Lane forcefully handcuffed Plaintiff's right arm

to a cell bar on the exterior of one of the holding cells in the 60th Precinct for a period of

several hours.  This application of force placed great pressure on Plaintiff's surgical site

causing him great pain.  These applications of force did not help to facilitate the arrest or

detainment.  Rather, said applications of force were excessive, sadistic, reckless and

objectively unreasonable for officers in their position, thus depriving Plaintiff of the

rights secured by the Fourth and Fourteenth Amendments.

## COUNT 4
### Violation of Civil Rights Pursuant to Title 42 U.S.C. § 1983
### (Municipal Liability)

### Against Defendant City of New York

147.    Plaintiff repeats and realleges the allegations set forth in paragraphs

numbered 1 through 138.

148.    Defendant City of New York has no written policy in place concerning

how its employees are to handle arrestees or detainees who require wheelchairs for

mobility.  The current NYPD Patrol Guide provides officers with little guidance

regarding how to transport individuals who use wheelchairs.  Defendant City of New

York was aware, prior to June 15, 2012, that its officers in the NYPD would at some

point encounter and arrest individuals who require wheelchairs for mobility.

Furthermore, by June 15, 2012, Defendant City of New York knew that arresting

individuals who use wheelchairs for mobility was a difficult situation for officers in the

NYPD because there was a history of officers in the NYPD mishandling such situations.

Defendant City of New York was consequently aware that mishandling arrestees could result in the deprivation of constitutional rights secured by the Fourth and Fourteenth Amendments.

149.    Defendant City of New York's failure to implement an adequate policy or practice to guide its officers in the NYPD on how to handle arrestees who use wheelchairs for mobility resulted in the violation of Plaintiff's rights secured by the Fourth and Fourteenth Amendments causing him extreme pain, physical and emotional injury, and humiliation.

### COUNT 5
**Violation of Civil Rights Pursuant to Title 42 U.S.C. § 1983**
**(Excessive Force and Deliberate Indifference to a Serious Medical Condition in Violation of the Fourth and Fourteenth Amendments)**

### Against Defendant Neldra Zeigler

150.    Plaintiff repeats and realleges the allegations set forth in paragraphs numbered 1 through 138.

151.    The conduct of Defendant Zeigler was performed under color of state law.

152.    Defendant Deputy Commissioner Neldra Zeigler, is and was, at all times relevant hereto, Deputy Commissioner, Office of Equal Employment Opportunity for the NYPD.  Deputy Commissioner Zeigler is the NYPD's ADA Coordinator and as such is responsible for coordinating the efforts of the NYPD to comply with the Americans with Disabilities Act.

153.    Defendant Zeigler failed to make sure that the NYPD was compliant with the ADA.  Her failure to ensure compliance resulted in the violations of Plaintiff's rights under the Fourth and Fourteenth Amendments.

### COUNT 6

27

**Violation of Civil Rights Pursuant to Title 42 U.S.C. § 1983**
**(Deliberate Indifference to a Serious Medical Condition in Violation of the**
**Fourteenth Amendment)**

**Against Defendants Gerard Beyrodt, Michael Healy, Florin Kuka, Ryan Lane,**
**Theodore Lauterborn, Alessandro Longardino, Christopher McGuinness, Manuel**
**Rodriguez, Daniel Ticali, James Williams, and Dmitry Brushnivsky**

154.    Plaintiff repeats and realleges the allegations set forth in paragraphs

numbered 1 through 138.

155.    Defendants, acting in concert and under the color of state law at all times

relevant to this Complaint, failed to provide adequate treatment of Mr. Krieg's

paraplegia, post-surgical condition and urinary incontinence demonstrating deliberate

indifference and/or willful neglect to Plaintiff's serious medical needs constituting cruel

and unusual punishment in violation of the Fourteenth Amendment.


Dated: New York, NY
         June 15, 2015

                              _____/s/_____
                              BETSY GINSBERG, ESQ.
                              CARDOZO CIVIL RIGHTS CLINIC
                              Attorney for Plaintiff
                              IMRAN DAR
                              DANIEL STERNBERG
                              Law Student Interns

                              Benjamin N. Cardozo School of Law
                              55 5th Avenue, 11th Floor
                              New York, NY 10003
                              (212) 790-0871
                              Betsy.ginsberg@yu.edu